Roy NEWTON *v.* STATE of Arkansas

CA CR 00-1057                                    43 S.W.3d 170

Court of Appeals of Arkansas
Division III
Opinion delivered April 25, 2001

286

*Fields, Tabor, Langston & Shue, P.L.L.C.*, by: *Daniel Shue*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Michael C. Angel*, Ass't Att'y Gen., for appellee.

JOHN F. STROUD, JR., Chief Judge. Appellant, Roy Newton, entered a conditional plea of guilty to the offense of possession of a controlled substance with intent to deliver. He was sentenced to twelve years in the Arkansas Department of Correction, followed by a six-year suspended imposition of sentence, and was assessed fines and court costs in the amount of two thousand dollars. Newton's sole point on appeal is that the trial court erred in denying his motion to suppress. We affirm.

█ When reviewing the trial court's denial of a motion to suppress, the appellate courts make an independent determination based on the totality of the circumstances and reverse only if the trial court's ruling was clearly against the preponderance of the evidence. *Embry v. State*, 70 Ark. App. 122, 15 S.W.3d 367 (2000).

At the hearing on the motion to suppress, Russellville Police Officer Chris Goodman testified that he was on patrol in a high-crime area the night of July 2, 1999, when he stopped the car Newton was driving at approximately 10:13 p.m. because Newton had crossed the center line several times. Goodman stated that Newton was visibly shaking and would not make eye contact when Goodman asked for his driver's license. When asked for the insurance and registration papers for the car, Newton advised Goodman that his girlfriend, Elizabeth Brennan, had rented the vehicle at the Tulsa Airport, and they had misplaced the paperwork. Brennan was a passenger in the vehicle and confirmed that she was the person who had rented the vehicle.

When asked to step out of the vehicle, Newton said, "I'm not drinking. I haven't been drinking and I'm sorry for driving bad. It's just that it's a new car and I'm just trying to get adjusted to driving it." While Newton was outside the vehicle, Goodman asked him what he was doing in the area, to which Newton responded that he was visiting family. He also stated that he had known Brennan for only two months. When Brennan was questioned separately, she said they were in Arkansas visiting friends and that she had known Newton for five or six months.

At this time, Goodman called for a backup officer, and Russellville Police Officer William Ridenhour responded. Although he believed that something was "wrong," Goodman decided to only write Newton a warning citation. As he explained to Newton what he was doing, appellant was walking around unsteadily and talking very fast. After issuing the warning citation, Goodman advised Newton that he was free to leave. However, Goodman requested and received permission from Brennan, as the person who had rented the vehicle, to search the automobile.

Goodman began a manual search of the vehicle, but Ridenhour, the canine handler for the Russellville Police Department, had arrived and suggested that the officers conduct the search with his dog, Anuck, to perform the search more quickly. As Ridenhour began the search with Anuck, Goodman explained to Newton what the dog was doing during the search.

While Ridenhour and Anuck were conducting the consensual search of the vehicle, Newton was standing on the driver's side of Goodman's patrol car, holding Brennan tightly in front of his body with his arms around her. When Anuck scratched on the passenger side door of the vehicle, which is a sign for the presence of drugs, Goodman asked Newton if he saw what the dog was doing, to which Newton replied, "Yes." At that time, Newton released Brennan and placed his hands in his pants pockets. When he placed his hands in his pockets, he raised his shirt, and at that time Goodman observed a bulge on the left side of Newton's groin. Newton then turned away from Goodman and started walking to the back of the police cruiser; Goodman then stopped him and asked him to place his hands on the car so that he could pat him down for weapons.

During the patdown, Goodman felt a very hard object in Newton's pants where he had observed the bulge, at which time Newton attempted to jerk away. Goodman handcuffed Newton, and called for Ridenhour, who removed the object from Newton's

pants. Ridenhour estimated the packet to be approximately eighteen inches long, and it consisted of a set of scales that Ridenhour testified were six to seven inches long and enclosed in a hard carrying case, a baggie of methamphetamine in rock form, and a baggie of methamphetamine in powder form. All of these items were contained in one large plastic bag.

Goodman testified that he did not feel that he needed to pat Newton down for weapons until Anuck alerted on the vehicle for drugs, and Newton raised his shirt, revealing the bulge, and began walking behind the police cruiser. The patdown for weapons was not triggered until "all of these things built up" and Goodman saw the bulge at Newton's groin.

Newton concedes that Goodman's initial stop for a traffic violation was appropriate; however, he contends that although he was told he was free to leave, he really was not free to leave because he could not drive the car away. Although Newton could not leave in the vehicle, that has no bearing on whether he was free from police custody. The reason he could not drive away in the vehicle was due to the fact that his girlfriend, who by his own admission was the person who had rented the car, had given her consent for the automobile to be searched. *See Muhammad v. State*, 337 Ark. 291, 988 S.W.2d 17 (1999)(holding that a stop can be extended by authorizing a search of the vehicle).

Appellant also argues that the stop exceeded the fifteen-minute limit provided for in Rule 3.1 of the Arkansas Rules of Criminal Procedure, and therefore the articles seized during the search of his person must be suppressed. We disagree.

Rule 3.1 of the Arkansas Rules of Criminal Procedure provides:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period

the person detained shall be released without further restraint, or arrested and charged with an offense.

In the present case, the testimony revealed that from the time of the stop to the time of Newton's arrest was a period of between seventeen and twenty minutes. Although this period of time exceeds the stated fifteen minutes, it is of no moment because a person may be detained under Rule 3.1 "for a period of not more than fifteen (15) minutes *or for such time as is reasonable under the circumstances.*" (Emphasis added.) In the present case, the officers acted diligently and caused no undue delay in performing the consensual search; furthermore, appellant's girlfriend extended the stop by consenting to the search of the car. *See United States v. Sharpe*, 470 U.S. 675 (1985) (holding that a twenty-minute detention was reasonable when the police acted diligently and the defendant contributed to the delay). We cannot say that the seventeen-to-twenty-minute search was unreasonable under the circumstances.

Newton next contends that Goodman was not authorized to conduct a weapons search under Rule 3.4 because there was no indication Newton was committing, had committed, or was about to commit a felony or a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property under Rule 3.1. We disagree. Goodman had legally stopped Newton for a traffic violation and obtained consent from Brennan to search the car, and he developed a reasonable suspicion that Newton had committed or was committing a felony at the time Anuck, the drug dog, alerted the officers of the possibility of drugs in the car. A drug dog's identification of drugs in a car provides probable cause that drugs are present. *United States v. Bloomfield*, 40 F.3d 910, 919 (8th Cir. 1994).

Newton further argues that there were no specific and articulable facts that the officers observed the bulge in his pants to be a weapon; therefore a search under Rule 3.4 was not permissible. We must disagree.

Rule 3.4 of the Arkansas Rules of Criminal Procedure provides:

If a law enforcement officer who has detained a person under Rule 3.1 reasonably suspects that the person is armed and presently dangerous to the officer or others, the officer or someone designated by him may search the outer clothing of such person and the

immediate surroundings for, and seize, any weapon or other dangerous thing which may be used against the officer or others. In no event shall this search be more extensive than is reasonably necessarily to ensure the safety of the officer or others.

Rule 2.1 of the Arkansas Rules of Criminal Procedure defines "reasonable suspicion" as:

[A] suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion.

Arkansas Code Annotated section 16-81-203 (1987) sets forth factors to be considered when determining whether an officer has grounds for reasonable suspicion. Of these factors, the ones present in this case include the demeanor of the suspect; the gait and manner of the suspect; the manner in which the suspect is dressed, including bulges in clothing, when considered in light of all of the other factors; the time of the day or night the suspect is observed; incidence of crime in the immediate neighborhood; and the suspect's apparent effort to conceal an article.

In the present case, Newton had been stopped at night in an area known for its crime, and he was visibly nervous during the entire stop, walking around unsteadily and talking very fast. During the consensual search, Anuck alerted on the passenger door of the vehicle, indicating the presence of drugs in the car. At that time, Newton raised his shirt, revealing a bulge on the left side of his groin. Upon a patdown search for weapons, this bulge was found to be hard and about eighteen inches long.

In support of his argument, appellant cites *Bell v. State*, 68 Ark. App. 288, 7 S.W.3d 343 (1999), and *Pettigrew v. State*, 64 Ark. App. 339, 984 S.W.2d 72 (1998). However, both of these cases are distinguishable from the case at bar.

In *Bell*, the officer noticed a bulge in the appellant's left rear pants pocket and frisked him for weapons. However, the officer testified that the bulge "felt like a plastic bag with what felt like a vegetable-like substance in the pocket." 68 Ark. App. at 290, 7 S.W.3d at 344. This court held in *Bell* that although the officer was justified in performing a weapons search, because the initial frisk yielded no weapons, the search should have ended at that point. In

the present case, the officers testified that the search indicated a hard bulge to the left of Newton's groin. This fact is certainly distinguishable from the facts in *Bell* where the officer's testimony could in no way support the possibility of finding a weapon during the search.

Likewise, *Pettigrew* is also distinguishable from the case at bar. In that case, the officer observed appellant and four other individuals in a car parked in a parking lot, and a passenger appeared to be drinking an alcoholic beverage. Open containers of beer and other alcoholic beverages were observed in the car. The officer ordered everyone out of the vehicle, and then immediately began a pat-down weapons search of appellant. During the search, the officer felt an object in the front waistband of appellant's pants, which was eventually determined to be seventy grams of cocaine. This court agreed with appellant that the officer had no specific and articulable facts upon which he could reasonably believe that appellant was armed and presently dangerous; therefore, the search for weapons in which the cocaine was found was not permissible, and the denial of appellant's motion to suppress was reversed.

The facts in the present case are substantially different from the facts in *Pettigrew*. In this case, Newton had appeared extremely nervous throughout the stop and even after he was told he was free to go. He was walking unsteadily and "babbling," and he and his passenger had told conflicting stories when questioned separately. After Goodman obtained consent to search the vehicle from Brennan, the person who had rented it, the drug dog alerted to the presence of drugs in the vehicle. When Newton saw the dog alert, he placed his hands in his pocket, causing his shirt to rise and exposing a large bulge on the left side of his groin as he was walking toward the rear of the police cruiser. Goodman stopped him and performed a patdown search, found the bulge to be hard, and called on Ridenhour to remove the object from his pants to determine if it was a weapon. Based upon the totality of the circumstances, we cannot say that the trial court's denial of appellant's motion to suppress was clearly against the preponderance of the evidence.

Affirmed.

PITTMAN and ROAF, JJ., agree.